United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

N.C.C.,

Plaintiff,

v.

SSA COMMISSIONER,

Defendant.

Case No. 25-cv-08200-LJC

**ORDER RESOLVING SOCIAL SECURITY DISABILITY ACTION**

## I. INTRODUCTION

Plaintiff N.C.C.[1] brings this action challenging the decision of Defendant the Commissioner of Social Security (the Commissioner) denying Plaintiff's application for disability benefits. The parties have consented to the jurisdiction of a magistrate judge for all purposes under 28 U.S.C. § 636(c) and filed briefs on the merits in accordance with the Federal Rules of Civil Procedure's Supplemental Rules for Social Security Actions Under 42 U.S.C. § 405(g).

For the reasons discussed below, the Court finds in favor of Plaintiff, except to the extent that he requests a judicial award of benefits rather than further administrative proceedings. The Commissioner's decision is REVERSED, and the matter is REMANDED for further administrative proceedings consistent with the Order.

## II. BACKGROUND

Plaintiff is a man in his sixties from Nicaragua who worked in the heating, ventilation, and

[1] Because opinions by the Court are more widely available than other filings, and this Order contains potentially sensitive medical information, this Order refers to the plaintiff only by her initials. This Order does not alter the degree of public access to other filings in this action provided by Rule 5.2(c) of the Federal Rules of Civil Procedure and Civil Local Rule 5-1(c)(5)(B)(i).

United States District Court
Northern District of California

air conditioning (HVAC) industry through a contracting company that he owned at least until 2022. *See* Admin. Record (AR, ECF No. 7) at 1506.[2] This case turns on impairments of Plaintiff's knee, which has periodically painfully buckled. Though he has had other medical and mental health issues that are documented in the record, the administrative law judge (ALJ) found those to be non-severe, and Plaintiff presents no arguments based on those impairments here. The following summaries, as well as the Court's analysis below, therefore focus exclusively on Plaintiff's knee issues.

These summaries provide basic background information for the reader, and are not intended as a complete recitation of all relevant evidence in the administrative record. The Court has reviewed all evidence addressed by the parties and by the ALJ.

**A. Medical Records and Plaintiff's Reports**

Plaintiff contacted his medical provider (Kaiser) on December 1, 2022 reporting pain in both knees that caused him to fall. AR at 725. On December 5, he told Dr. Sony Haris that he had been experiencing discomfort in both knees over recent weeks, worse in his right knee than his left. AR at 730. Plaintiff reported that his right knee "feels weak and buckles over especially when he is climbing stairs or ladders," and that it was "unable to hold and gives out," though he "[d]enie[d] any falls" at that time. *Id.* Dr. Haris observed mild swelling of Plaintiff's right knee and "[m]ild tenderness medial and lateral aspect," but otherwise generally normal findings. AR at 731. Dr. Haris referred Plaintiff for orthopedic care. AR at 732. Dr. Haris reported that an x-ray of Plaintiff's knee was normal. AR at 740.

Dr. June Ong, an orthopedic doctor, saw Plaintiff on December 7, 2022. AR at 744. According to Dr. Ong's notes, Plaintiff reported that when he was using a ladder at work three weeks earlier, he "immediately felt superior patellar pain and [his] leg gave out." AR at 747. He had since experienced the same symptoms "about 2 times a day," with pain lasting for five minutes. *Id.* Dr. Ong acknowledged the "negative" x-ray ordered by Dr. Haris, though she noted

[2] This Order cites the administrative record using the continuous page numbers assigned by the Commissioner. This Order cites other documents in the record using page numbers assigned by the Court's ECF filing system.

United States District Court
Northern District of California

that on "[her] read he has some tiny spurs on posterior view [indicating] early arthritis." *Id.* Dr. Ong observed "[p]ositive McMurray's[3] with pain on bilateral joint lines" and that Plaintiff's knee was "[t]ender around the superior patella, lateral patella," as well as otherwise normal findings. AR at 389, 748. Dr. Ong ordered an MRI. AR at 747. *Id.*

The MRI revealed a tear in Plaintiff's meniscus and mild quadricep tendonitis, among other mild damage to his knee. AR at 518, 754. Dr. Ong noted that Plaintiff's pain was "consistent with quadricep tendinosis in the setting of medial meniscus tear and arthritis medially (asymptomatic)." *Id.* She noted that a cortisone shot might be recommended for medial pain but that Plaintiff denied experiencing such pain, and that an injection was "[n]ot recommended for quad tendon given high risk of rupture." AR at 755. She also noted that Plaintiff was fearful of climbing ladders at work. *Id.* Dr. Ong limited Plaintiff's work and home activity as follows, for the period from December 13, 2022 to February 12, 2023:

- Stand: Occasionally (up to 25% of shift)
- Walk: Occasionally (up to 25% of shift)
- Sit: Frequently (up to 75% of shift)
- Squat/kneel, knee bending: Not at all
- Climb stairs: Not at all
- Climb ladders: Not at all

AR at 758. Dr. Ong later extended the same restrictions to April 9, 2023. AR at 831.

At a December 23, 2022 physical therapy appointment, Plaintiff was not in pain while working with the therapist and demonstrated normal results on some tests. AR at 380–83. AR at 382. Plaintiff reported that he was continuing to feel his leg give out with sharp pain when climbing stairs in his home. AR at 381. The physical therapist observed tightness and hypomobility in Plaintiff's quadriceps, iliotibial band, and superior to his patella. AR at 382. Plaintiff could stand on his left leg for thirty seconds, but he could only stand on his right leg for five seconds "with loss of balance and increased sway." *Id.* It was difficult for him to step up over two steps, and he showed "notable instability at the top of range." *Id.* The physical therapist noted "right knee weakness with muscle weakness, muscle guarding, muscle tightness, and

[3] McMurray's test is used to diagnose meniscus tears. *See Bishop v. Thomas*, No. CV 19-01757-PHX-JAT (JFM), 2020 WL 7263385, at *2 n.3 (D. Ariz. Dec. 10, 2020).

tenderness" and "lower extremity weakness and instability," affecting Plaintiff's "ability to climb up ladders, ascend stairs, and work." AR at 383. Notes from a January 23, 2023 physical therapy appointment were materially identical. AR at 373, 818.[4]

Plaintiff received a trial cortisone injection in his right knee on February 9, 2023. AR at 825. His knee was tender at that time but he exhibited quadricep activation with good strength. AR at 826.

On March 8, 2023, Dr. Ong spoke to Plaintiff by telephone to discuss the results of a February injection, which provided "mild relief." AR at 837. Dr. Ong noted that there were "limited options for quad tendon pain." AR at 838. She recommended physical therapy but no further procedures. AR at 838. Dr. Ong imposed the following restrictions through May 28, 2023, which were similar to what she had prescribed before:

- Stand: Occasionally (up to 25% of shift)
- Walk: Occasionally (up to 25% of shift)
- Sit: Frequently (up to 75% of shift)
- Squat/kneel, knee bending: Occasionally (up to 25% of shift)
- Lift/carry/push/pull no more than 10 pounds

AR at 841. Dr. Ong later extended those restrictions to July 30, 2023, AR at 920, and then to November 30, 2023, AR at 1060.

A physical therapy note from June 14, 2023 indicated that Plaintiff's knee was giving out three or four times a week, and that he only felt pain when his knee gave out. AR at 930. He had no pain while meeting with the physical therapist, but reported pain levels of seven or eight out of ten at its worst. *Id.* An examination "revealed right knee and hip weakness, gait deviations, and symptoms of patellofemoral pain syndrome." AR at 931. Clarke's test (which is used to diagnose patellofemoral pain syndrome[5]) was positive, but McMurray's test was negative. *Id.* Plaintiff responded well to therapy and exhibited "good motor control with his eccentric loading activity after demonstrations and verbal cues," but he was only able to balance on his right leg for less than

---

[4] Some of Plaintiff's medical records appear multiple times in the administrative record in different formats. This Order does not consistently cite all redundant copies of the same reports.
[5] *See Topalovic v. Saul*, No. 4:18-cv-962-ERW, 2019 WL 4305133, at *9 n.8 (E.D. Mo. Sept. 11, 2019).

United States District Court
Northern District of California

two seconds. *Id.*

At a physical therapy session on July 12, 2023, Plaintiff reported that his knee had buckled three times since his last visit. AR at 869. He stated that the single-leg squat exercises that he had been prescribed caused him pain. *Id.* He was able to balance on his right leg for six seconds. AR at 870. He was "making good progress towards his goals" (despite one of those goals being to stand on his right leg for thirty seconds with good control, AR at 869), but demonstrated gait deviations and weakness in his right knee and hip. AR at 870.

In an August 30, 2023 progress note, Dr. Ong indicated that Plaintiff "[c]ontinue[d] to feel giving way in the right leg with sudden weakness and pain," and that he "fell and hit his knee earlier this month," though his overall pain around his patella was improving. AR at 906–07. Plaintiff demonstrated "[s]ignificant inhabitation of the right quadriceps muscle" and some tenderness. AR at 907. Dr. Ong reported that Plaintiff's treatment included physical therapy, modified work, a February 9, 2023 cortisone injection to Plaintiff's knee that provided "mild relief," and "**<u>Cane</u>**." *Id.* (emphasis in original). Dr. Ong offered a cortisone shot for pain that Plaintiff was experiencing on the medial side of his knee due to early arthritis, which Plaintiff "decline[d] for now." *Id.* Dr. Ong also discussed the possibility of prolotherapy for Plaintiff's quadricep tendon, which could "increase pain temporarily," but Plaintiff was not interested. *Id.* Dr. Ong noted that Plaintiff would contact her when he was feeling better and ready for further physical therapy. *Id.* An x-ray of Plaintiff's knee in August 2023 did not indicate acute fracture, dislocation, significant effusion, or significant degenerative changes. AR at 909.

In a February 26, 2024 function report, Plaintiff reported that he mowed the lawn and completed household repairs that did not require him to climb, each for two hours. AR at 276. He reported that his daily activities included "go[ing] to work" and "pick[ing] equipment for [the] next day." AR at 275. Plaintiff stated that he was not able to climb (including stairs), kneel, or squat. *Id.* at 275, 279. He reported that he could lift only twenty pounds, could not "bend too often" or "be standing too long," and that he could walk for only thirty to forty-five minutes before requiring a thirty-minute rest. AR at 279. Plaintiff stated that he was prescribed a brace at his first doctor's visit for his knee. AR at 281.

The following day, Plaintiff completed a work history report indicating that he worked as an air conditioning mechanic in the HVAC business from 2009 to 2024, for five days per week, eight hours per day. AR at 303–04. He wrote that his work involved climbing on ladders and working on roofs. AR at 304. He wrote that each day, he walked for 1 hour, stood for 2 hours, knelt for 2 hours ("when not stand[ing]"), crouched for 1 hour, and climbed and crawled for 0.5 hours each (or perhaps 5 hours—it is difficult to discern whether these answers include a decimal point). *Id.* Plaintiff indicated that he carried more than one hundred pounds for more than two-thirds of the day, and that he did not supervise other people. *Id.*

Dr. Lara Salamacha, and orthopedic physician, examined Plaintiff on March 29, 2024. AR at 1506. She noted that Plaintiff reported having ceased his HVAC work "about a year ago because he was having pain in his right leg just above the kneecap." *Id.* Dr. Salamacha noted that physical therapy records indicated patellofemoral syndrome, but she stated that Plaintiff "actually localized his pain to the quadriceps tendon above the kneecap," rather than reporting pain behind his kneecap. *Id.* She wrote that the injection to Plaintiff's knee "did not help which is not surprising if his true symptoms are in the quadriceps tendon." *Id.* Dr. Salamacha noted that an x-ray and MRI had shown mild degenerative changes in Plaintiff's knee. *Id.* She described Plaintiff's complaints as follows:

> He has experienced sensation of the knee giving way while walking up stairs or stepping up on a ladder and due to his fear of falling from a ladder or the roof, he has stopped working, he can walk a few blocks without difficulty and stand for 30 minutes. He does not have pain in the knee with level walking but states that occasionally, his knee will buckle and he is afraid that he will fall.

AR at 1506.

Dr. Salamacha observed "a normal reciprocal gait," and that Plaintiff was "able to walk on both the toes and heels with good intact knee strength." AR at 1507. Plaintiff brought a cane that he had purchased three weeks earlier "to use out of the home," but he was "able to walk in the examination room without the cane without any difficulty." *Id.* Dr. Salamacha observed normal strength and sensation, and made the following general findings regarding Plaintiff's knee:

> The right knee is nontender at the patellofemoral joint lines at the

> medial and lateral facets. There is no crepitus or effusion noted. The claimant is tender at the insertion of the quadriceps tendon at the superior border of the patella. There is no tenderness over the medial or lateral joint lines. ACL, PCL, MCL and LCL are intact to stresses. Lachman and anterior drawer tests are within normal limits. There is no effusion or patellofemoral crepitus noted on examination.

AR at 1507. Without explanation, she reported 0 to 40 degrees of flexion for Plaintiff's non-injured left knee, and 0 to 130 degrees of flexion for his right knee. *Id.*

Based on her examination, Dr. Salamacha reached the following conclusions regarding Plaintiff's diagnosis and functional limitations:

> **Diagnosis / Discussion**
> 1. Right knee insertional quadriceps tendonitis at the superior border of the patella. There is minimal evidence of patellofemoral syndrome at this time. The claimant has had physical therapy and states that he is having difficulty with some of the home exercises because they are exacerbating his symptoms. He had an injection with no change in his symptoms which would support the diagnosis of a quadriceps tendonitis rather than patellofemoral syndrome, which is intra-articular and may respond to a steroid injection. He stopped working because his leg has the sensation of giving way when he steps up on to stairs or ladders occasionally and he is afraid of falling from the ladder or from the roof.
>
> **Functional Assessment:** The claimant may stand and walk on level surfaces for two hours in the first half and two hours in the second half up to a maximum of six hours [sic] in an eight-hour period. There are no restrictions regarding sitting. He may not walk on stairs without a handrail and he may not climb ladders or climb on the roof at this time due to pain in his quadriceps tendon, which causes the knee to buckle unexpectedly. He may use his cane as needed for long distance walking outside the home and should use the cane in the contralateral left (hand). He may lift 10 pounds frequently and 25 pounds occasionally and 50 pounds maximally at a table top level and should not be perfuming squatting to lift from floor to table level due to his quadriceps tendonitis. He may perform occasional bending and rare stooping with no crouching due to his quadriceps tendonitis. There are no manipulative limitations for reaching, handling, feeling, fingering or grasping with bilateral upper extremities. There are no visual, communicative or work place environmental limitations.

AR at 1507–08.

On April 15, 2024, non-examining state agency medical consultant Dr. S. Strong determined that Plaintiff could stand or walk for up to six hours in a workday (with normal breaks); frequently climb ramps or stairs; occasionally climb ladders, ropes, or scaffolds; and frequently stoop, crouch, or crawl; among other relatively permissive limitations. AR at 85. Dr. Strong appears to have construed Dr. Salamacha's report as indicating "essentially a LIGHT"

United States District Court
Northern District of California

capacity, but found that there was no twelve-month period of time "where a MEDIUM RFC would not be supported given ongoing [treatment and physical therapy]." AR at 83.

On September 16, 2024, Plaintiff's knee gave out and he fell down a flight of stairs. AR at 2494.

Plaintiff again fell on the stairs when his knee gave out on December 18, 2024 and continued to feel pain in his right knee afterwards. AR at 2510. A doctor at an urgent care clinic recommended that he use a hinged knee brace and follow up with the orthopedic department. AR at 2509. The doctor noted that Plaintiff was using a cane. *Id.* An x-ray identified no acute fracture or dislocation, but small joint effusion. AR at 2533.

On January 6, 2025, Plaintiff submitted a work background report indicating that he worked in the HVAC business from January 1990 to "now," including working on roofs, in attics, under houses, and on ladders. AR at 348.

Plaintiff's Kaiser records indicate that Plaintiff's preferred language is Spanish, *e.g.*, AR at 745, 923, but he at least at times declined to use an interpreter, AR at 1475.

**B. Administrative Hearing**

Administrative law judge Tova Wolking held a hearing on February 5, 2025. AR at 45. Plaintiff testified through a Spanish language interpreter, though he confirmed that spoke and understood at least some English. AR at 48–49.

At the start of the hearing, the ALJ indicated that she "th[ought] the most important thing to talk about right now is [Plaintiff's] work history." AR at 51. She asked Plaintiff about his January 2025 report indicating that he was still performing HVAC work, and Plaintiff responded that he stopped that work in 2022 and made a mistake when completing the form. AR at 52. Plaintiff testified that he still owned his business, but he had not had any earnings over the past three years. *Id.*

The ALJ also asked Plaintiff about work he did in 2024 as an In-Home Supportive Services (IHSS) care provider for his elderly mother, who suffers from dementia. AR at 52. Plaintiff testified that he and his wife share responsibility caring for his mother, and he "spend[s] about eight hours a day taking care of her." *Id.* Plaintiff testified that he and his wife are

United States District Court
Northern District of California

collectively paid for 283 hours of work, though he did not make clear over what period. AR at 53.

Returning to Plaintiff's HVAC work, the ALJ asked Plaintiff again when he last performed HVAC service, and Plaintiff reiterated that he last did so in December of 2022. AR at 53. Plaintiff testified that his work requires climbing extension ladders to access roofs, his "knee failed [him]" that month, and he "ended up hanging from the ladder during [his] work." *Id.* Plaintiff testified that he canceled other jobs that he had booked, and the employees that he had in that business no longer work for him. AR at 53–54. He stated that he did not earn any further income from that business based on work performed by his former employees. AR at 54.

The ALJ then turned back to Plaintiff's home care work, because "someone who is currently working is not eligible for disability benefits, if they are working at the level of substantially gainful activity," though she acknowledged that Plaintiff's home care income "does not appear to be at the level of substantially gainful activity." AR at 54. Plaintiff testified that he started performing that work about a year before the hearing. *Id.* Plaintiff testified again that he shared responsibility with his wife, and that he worked around eight hours a day. *Id.* His work consisted of ensuring that his mother did not "leave the house and engage in activity that she shouldn't be engaging in" based on her dementia. *Id.* He needed to move around the house to stay close enough to his mother to monitor her. AR at 55. He did not do any cooking or cleaning. *Id.*

The ALJ suggested at this point that it seemed Plaintiff could work: "when you tell me that you work eight hours a day as an IHSS care provider, to me, that says you can work an eight hour a day job." AR at 55. Plaintiff testified that he also sometimes needed to take breaks because his sleep apnea and depression resulted in sleep deprivation, and that he would ask his wife to take over watching his mother while he "lay down for an hour or so" to rest. AR at 56. The ALJ asked Plaintiff again how much time he spent caring for his mother, and Plaintiff testified that his hours were assigned by the IHSS program, but the "most [he] can dedicate is eight hours, and doing it in the matter [sic] that [he] explained." *Id.*

The ALJ then asked Plaintiff's attorney Peter Natale if he understood what she was trying to get at, and if he might "have better luck than [she was] having." AR at 56. Plaintiff's counsel

asked him to explain his typical day caring for his mother. AR at 57. Plaintiff testified that he would typically eat breakfast and then spend around three hours sitting with his mother and following her if she walked around the house. *Id.* Plaintiff might then rest for two hours while his wife or someone else watched his mother. *Id.* Plaintiff would resume watching his mother later, and would "[i]n total . . . keep an eye on her about five hours out of the eight hour shift that [he] mentioned." *Id.* The ALJ resumed questioning, and Plaintiff explained that his work consisted of sitting with his mother, watching to ensure that she did wander off, and ensuring that she takes her medication. AR at 58. Plaintiff testified that was "all [he] can do in regard to [his] mother." AR at 59. Plaintiff did not help his mother with dressing or bathing, which his wife handled. AR at 58.

The ALJ asked Plaintiff what kept him from working, and Plaintiff identified the problem with his knee: "I don't know when it's going to fail and I don't know the outcome of that yet." AR at 59.[6] The ALJ did not ask Plaintiff any questions about his knee. *See id.*

Plaintiff testified that he attended some college in Nicaragua but did not obtain a degree. AR at 61. He testified that he communicated with customers in English when he owned his HVAC business, and that he was able to write in English "[a] little." *Id.* He took a test in English to obtain a license for that work. *Id.*

The ALJ then turned to questioning a vocational expert (the VE), noting that they were running out of time to complete the hearing. AR at 62. The VE classified Plaintiff's past work as a heating and air conditioning installer corresponding to code 637.261-014 in the Dictionary of Occupational Titles, which is medium work as typically performed but was heavy work as Plaintiff actually performed it. AR at 63.

The ALJ asked the VE if there would be work available for someone of Plaintiff's age, education, and work experience who could perform medium work with the following restrictions: standing and walking up to six hours in an eight-hour day, occasional bending and stooping, no

[6] Plaintiff also mentioned his sleep apnea, depression, and anxiety, which he has not pursued in this action, and the ALJ and Plaintiff discussed an apparently erroneous indication that Plaintiff was blind. AR at 59–60.

crouching, and use of a cane for walking more than one hundred feet. AR at 63–64. The VE testified that no work would be available.

The ALJ then posed a second hypothetical, with restrictions to "standing and walking on level surfaces for two hours in the first half, and two hours in the second half of an eight hour day . . . for a maximum of six [sic] hours in an eight hour day," with need to use a cane for walking more than one hundred feet, as well as certain lifting restrictions and postural limitations. AR at 64. The VE testified that such a person could not perform Plaintiff's past work or other medium work. *Id.* The VE also testified that Plaintiff would not have skills that would be transferable to other work. AR at 65.

The ALJ then returned to the question of how many hours Plaintiff worked caring for his mother, "[b]ecause if that's for eight hours a day, that tells me you can work for eight hours a day." AR at 69. Plaintiff testified that he worked "[s]upposedly eight hours," but that the work was shared with his wife and not distinguished between the two of them, the IHSS program paid the money to his wife's account, and that someone from the program told them that "it doesn't matter how many hours we dedicate to this matter, or how many hours we write on the form." *Id.* at 67–69.

### C. Five-Step Framework for Disability Determinations

The Social Security Administration uses a five-step process to determine whether claimants are disabled, and thus entitled to disability benefits:

> Step 1. Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "*not disabled*" within the meaning of the Social Security Act and is not entitled to disability insurance benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(b).
>
> Step 2. Is the claimant's impairment severe? If not, then the claimant is "*not disabled*" and is not entitled to disability insurance benefits. If the claimant's impairment is severe, then the claimant's case cannot be resolved at step two and the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(c).
>
> Step 3. Does the impairment "meet or equal" one of a list of specific impairments described in the regulations? If so, the claimant is "*disabled*" and therefore entitled to disability insurance benefits. If the claimant's impairment neither meets nor equals one of the

> impairments listed in the regulations, then the claimant's case cannot be resolved at step three and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(d).
>
> Step 4. Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is "*not disabled*" and is not entitled to disability insurance benefits. If the claimant cannot do any work he or she did in the past, then the claimant's case cannot be resolved at step four and the evaluation proceeds to the fifth and final step. See 20 C.F.R. § 404.1520(e).
>
> Step 5. Is the claimant able to do any other work? If not, then the claimant is "*disabled*" and therefore entitled to disability insurance benefits. *See* 20 C.F.R. § 404.1520(f)(1). If the claimant is able to do other work, then the Commissioner must establish that there are a significant number of jobs in the national economy that claimant can do. There are two ways for the Commissioner to meet the burden of showing that there is other work in "significant numbers" in the national economy that claimant can do: (1) by the testimony of a vocational expert, or (2) by reference to the Medical–Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2. If the Commissioner meets this burden, the claimant is "*not disabled*" and therefore not entitled to disability insurance benefits. *See* 20 C.F.R. §§ 404.1520(f), 404.1562. If the Commissioner cannot meet this burden, then the claimant is "*disabled*" and therefore entitled to disability benefits. *See id.*

*Tackett v. Apfel*, 180 F.3d 1094, 1098–99 (9th Cir. 1999) (footnote omitted); *see also Maxwell v. Saul*, 971 F.3d 1128, 1130 n.2 (2020).[7]

Before evaluating Steps 4 and 5, the ALJ assesses a claimant's residual functional capacity (RFC), which is "what the individual can still do despite her limitations." *See Mayes v. Massanari*, 276 F.3d 453, 460 (9th Cir. 2001). "At steps one through four, the claimant retains the burden of proof; at step five, the burden shifts to the Commissioner." *Maxwell*, 971 F.3d at 1130 n.2.

**D. The ALJ's Decision**

At Step 1, the ALJ determined that Plaintiff "appears to have continued working, full time as an HVAC mechanic until at least February 2024" based on his work history reports and unspecified "references throughout the medical records" that "confirm continued work activity

[7] The regulatory citations in this passage apply to adjudication of Disability Insurance benefits and refer to an earlier version of 20 C.F.R. § 404.1520 that is substantially similar to the current language of that regulation, but designated by different paragraphs. 20 C.F.R. § 416.920 sets forth materially identical steps to assess disability for the purpose of Supplemental Security Income benefits, which are not at issue in this case.

after the amended alleged onset date," notwithstanding his hearing testimony to the contrary. AR at 25–26. The ALJ also noted Plaintiff's testimony that he worked eight hours per day as an IHSS care provider. AR at 26. Because Plaintiff's IHSS earnings did not rise to the level of substantial gainful activity and his purported HVAC earnings "appear[ed] to be under the table" with no indication of how much he made, however, the ALJ "resolve[d] this conflict in favor of the claimant" and found no substantial gainful activity. AR at 26.

At Step 2, the ALJ identified Plaintiff's "tendinitis of the right quadriceps tendon and osteoarthritis of the right knee" as severe impairments. AR at 26. The ALJ found other alleged impairments, which are not at issue here, to be non-severe. AR at 25–29.

At Step 3, the ALJ determined that Plaintiff's knee impairments did not meet or equal Listing 1.18, for abnormality of a major joint in an extremity. AR at 29. Plaintiff does not challenge that determination here.

For the purpose of the remaining steps, the ALJ assessed Plaintiff's RFC as:

> medium work as defined in 20 CFR 404.1567(c) except he can stand and walk about 6 hours in an 8-hour workday; sit about 6 hours out of an 8-hour workday; frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; frequently stoop, crouch, and crawl; and occasionally kneel.

AR at 29.

The ALJ recited portions of Plaintiff's testimony and other statements in various reports, and determined "that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." AR at 29–31. The ALJ did not identify any specific statements concerning Plaintiff's symptoms that she did not find credible. *See id.*

The ALJ then recited portions of Plaintiff's treatment records regarding his knee, including acknowledging several falls and diagnoses of tendonitis, meniscus tear, and arthritis, but noting that Plaintiff had otherwise relatively normal imaging, showed improvement in physical therapy, and was able to walk normally on examinations. AR at 31–33. The ALJ against stated that

Plaintiff's "statements regarding the extent and limiting effects of his symptoms are not consistent with the medical and other evidence in the record," but again did not identify any such statements. AR at 33. The ALJ noted Plaintiff's reported daily activities of continued work as an HVAC technician and an IHSS care providers as indicating "greater functional ability than alleged at the hearing," but did not state what ability Plaintiff alleged at the hearing. *Id.*

In evaluating medical opinion evidence, the ALJ found Dr. Strong's opinions consistent with the medical record and with reported activities like "working, driving, shopping for tools, and mowing the lawn." AR at 34. The ALJ found Dr. Salamacha's opinions "not persuasive" and "not supported nor consistent with the evidence" based on normal gait, strength, and range of motion observations, "minimal imaging findings," and Plaintiff's reported activities, among other evidence in the record. AR at 34–35. The ALJ asserted that "quadriceps tendonitis would be expected to improve within less than 12 months, which would not satisfy the duration requirements." AR at 35. The ALJ found Dr. Ong's opinions unpersuasive for the same reasons. *Id.*

The ALJ noted that an urgent care physician prescribed Plaintiff a hinged knee brace in December of 2024, but asserted that to "the extent this information is interpreted as a requirement for an assistive device, it is not supported by the actual physical examination findings at this examination" or "with the overall evidence of record." AR at 35–36. The ALJ found that except for that treatment note, "there is minimal evidence that the claimant needs or uses a knee brace." AR at 36.

At Step 4, the ALJ determined that the RFC she assessed would permit Plaintiff to perform his past work as it is generally performed, based on the requirements stated in the Dictionary of Occupational Titles for the job classification that the VE identified at the hearing. AR at 37. The ALJ therefore determined that Plaintiff was not disabled.

**E. The Parties' Arguments**

**1. Plaintiff's Brief**

Plaintiff contends that the ALJ did not provide sufficient reasons for declining to credit the opinions of Drs. Salamacha and Ong. *See generally* ECF No. 8. Plaintiff notes that the VE

testified that the limitations Dr. Salamacha assessed would preclude Plaintiff's past relevant work and that Plaintiff would not have any transferrable skills. *Id.* at 4. Plaintiff asserts that a finding of disability is therefore compelled under applicable regulations. *Id.* (citing 20 C.F.R. pt. 404, subpt. P, app. 2, § 202.06).

Plaintiff argues that the tests of "supportability" and "consistency" did not support the ALJ's decision to credit Dr. Strong's opinions over Dr. Salamacha's. *Id.* at 7–8. Plaintiff contends that the ALJ failed to account for Dr. Salamacha's diagnosis of limitations resulting from quadriceps tendonitis based on her assessment of Plaintiff's knee tenderness and her review of the record, and that the ALJ erred in extrapolating Plaintiff's ability to walk normally in the examination room to completing a full workday. *Id.* at 5–7. Plaintiff argues that the ALJ failed to account for imaging showing significant damage to Plaintiff's knee (his torn meniscus), *id.* at 8; notes of a positive McMurray's test, decreased strength, and muscle inhibition, *id.* at 9; and Plaintiff's significantly impaired ability to balance on his right leg, *id.* Plaintiff argues that notes of his improvement at physical therapy do not show that he attained an ability to work. *Id.* at 9–10. Contrary to the ALJ's conclusion that Plaintiff declined treatment, Plaintiff asserts that he received a cortisone injection and that did not meaningfully improve his impairment. AR at 10. Plaintiff also notes that the ALJ's assertion that quadriceps tendonitis would not be expected to last twelve months, AR at 35, contradicted the ALJ's assessment of quadriceps tendonitis as a severe impairment at Step 2, AR at 25. ECF No. 8 at 6 n.1.

Plaintiff emphasizes that the relevant question here is not whether he was able to walk at all, which is not disputed, but instead whether he was able to perform his past work or other work available—and specifically other work at a medium exertion level, based on applicable regulations accounting for his age and education. *See id.* at 8.

Within his arguments regarding Dr. Salamacha's opinions, Plaintiff contends that the ALJ erred in concluding that Plaintiff had performed medium to heavy HVAC work through February 2024 because Plaintiff testified that he had not performed that work since 2022 and no medical evidence indicates that he was still doing that work later. *Id.* at 10–11. Plaintiff argues that the ALJ erred in treating Plaintiff's reported activity of mowing his lawn for two hours as indicating

United States District Court
Northern District of California

an ability to work because Plaintiff's function report did not indicate whether he mowed for two hours consistently or took breaks during that time. *Id.* at 11. To the extent the ALJ relied on Plaintiff's work caring for his mother, Plaintiff contends that the ALJ failed to account for his testimony of sharing that work with his wife and essentially only having to "be there so that his mother does not run off [or] potentially harm herself." *Id.* at 11–12.

Plaintiff argues that the ALJ erred in discrediting Dr. Ong's opinions for reasons similar to Plaintiff's arguments related to Dr. Salamacha. *Id.* at 13–15.

Plaintiff asks the Court to remand for an award of benefits rather than further administrative proceedings under the Ninth Circuit's credit-as-true rule.

**2. The Commissioner's Brief**

The Commissioner asserts that Plaintiff waived any challenge to the ALJ's assessment of Plaintiff's own symptom testimony by not squarely addressing that issue, though the Commissioner appears to acknowledge that "Plaintiff's discussion of the ALJ's assessment of the medical opinions involves an indirect challenge to the discounting of Plaintiff's subjective symptoms." ECF No. 12 at 6. The Commissioner argues that medical notes, test results, and only mild treatment—including turning down a cortisone injection—show that Plaintiff was not as impaired as he alleged. *Id.* at 7–10.[8]

The Commissioner also contends that the ALJ properly relied on inconsistent statements about Plaintiff's continued HVAC work, including the January 2025 form indicating that work was ongoing, to find that Plaintiff was not credible and not disabled. *Id.* at 10. The Commissioner asserts that Plaintiff's testimony about his work caring for his mother was also inconsistent. *Id.* at 10–11. According to the Commissioner (though not cited by the ALJ), Dr. Ong's notes placing Plaintiff on "modified activity at work and home" for much of 2023 suggest that Plaintiff was working at that time, and "it is not clear" whether those restrictions were consistent with Plaintiff's work caring for his mother. *Id.* at 11.

[8] The Commissioner notes for the record a longstanding objection to the Ninth Circuit's "clear and convincing" standard for rejecting claimants' symptom testimony, which this Court is bound by. *See* ECF No. 12 at 7 n.2.

The Commissioner argues that Plaintiff's reported activity of mowing his lawn supports the ALJ's finding "regardless of how long it took," because "activities that contradict claims of a total debilitation, even if performed with difficulty, may be considered in assessing claimant's subjective symptoms." *Id.* at 11–12 (citing *Molina v. Astrue*, 674 F.3d 1104, 1112–13 (9th Cir. 2012). The Commissioner argues that Plaintiff's "apparently inconsistent cane use" also supports the ALJ's finding that Plaintiff's symptom testimony was not credible. *Id.* at 12.

Turning to medical opinion evidence, the Commissioner argues that the ALJ's properly rejected Dr. Salamacha's opinions because Plaintiff demonstrated normal gait and strength during that examination, previous x-rays did not show a fracture or dislocation, some of Plaintiff's test results were normal, Plaintiff showed improvement during a short course of physical therapy, Plaintiff declined certain treatments, and Plaintiff's work and other activities indicate that he is not as impaired as Dr. Salamacha assessed him to be. *Id.* at 13–15. The Commissioner contends that Plaintiff cannot rely on his meniscus tear as supporting Dr. Salamacha's assessments because Dr. Salamacha did not attribute any limitations to that tear. *Id.* at 15–16. The Commissioner offers similar arguments with respect to Dr. Ong's opinions. *Id.* at 17–19.[9]

The Commissioner therefore argues that the ALJ properly assessed an ability to perform medium-exertion work with limitations. *Id.* at 20. To the extent that the Court finds any error, the Commissioner asks that the case be remanded for further proceedings rather than for an award of benefits. *Id.* at 21–22.

Plaintiff did not file a reply brief in response to the Commissioner's brief.

## III. LEGAL STANDARD

In cases challenging the denial of disability benefits, district courts have authority to review and "affirm[], modify[], or revers[e] the decision of the Commissioner of Social Security,

[9] The Commissioner also asserts that the ALJ "observed that Dr. Ong's opinion was internally inconsistent as she did not give an opinion on lifting or carrying, yet opined that Plaintiff required 'significantly reduced standing and walking and limitations on postural activities.'" ECF No. 12 at 18 (quoting AR at 35). The ALJ made no such finding of internal inconsistency. The ALJ noted that "Dr. Ong does not give an opinion on lifting or carrying," and found Dr. Ong's assessment of "significantly reduced standing and walking and limitations on postural activities" to be "inconsistent with the longitudinal evidence," but did not find the lack of lifting and carrying restrictions to inherently contradict limitations in other areas. AR at 35.

with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "An ALJ's disability determination should be upheld unless it contains legal error or is not supported by substantial evidence," which "'means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion.'" *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007)). A court must consider evidence both supporting and detracting from the Commissioner's decision; if the evidence could reasonably support either outcome, the court may not substitute its judgment for that of the ALJ. *Id.* at 1010. Courts "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Id.*

## IV. ANALYSIS

### A. Plaintiff's Statements

Plaintiff frames his brief primarily as a challenge to the ALJ's treatment of medical opinion evidence, but portions of his arguments also implicate the ALJ's treatment of Plaintiff's own testimony and reports of his symptoms. Plaintiff notes the ALJ's failure to address the repeated falls that Plaintiff reported to his doctors, *see* ECF No. 8 at 9, 10, as well as his hearing testimony that he has not worked since December 2022, *id.* at 11. Plaintiff's presentation of those arguments leaves much to be desired, but contrary to the Commissioner's arguments, ECF No. 12 at 6, the Court does not find that Plaintiff waived them. The Commissioner was able to discern the relevance of those issues sufficiently to devote a significant portion of his brief to the ALJ's treatment of Plaintiff's credibility, *id.* at 6–12, and the Court therefore addresses that issue as well.

The Ninth Circuit has "established a two-step analysis for determining the extent to which a claimant's symptom testimony must be credited." *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* (quoting *Garrison*, 759 F.3d at 1014–15). If the claimant meets this requirement and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for

doing so. This is not an easy requirement to meet: The clear and convincing standard is the most demanding required in Social Security cases." *Id.* To satisfy the "clear and convincing reasons" requirement, "[g]eneral findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015) (quoting *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998)).

The ALJ here assessed Plaintiff's credibility as follows:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

AR at 31.

The Ninth Circuit has repeatedly held that this sort of "'boilerplate statement' by way of 'introductory remark,' which is 'routinely include[d]' in ALJ decisions denying benefits," is insufficient when an ALJ fails to go on to "'identify what parts of the claimant's testimony were not credible and why.'" *Lambert v. Saul*, 980 F.3d 1266, 1277 (9th Cir. 2020) (quoting *Treichler*, 775 F.3d at 1103) (alteration in original). The ALJ did not do so here. The ALJ returned to Plaintiff's credibility after reciting various portions of the medical record, but again asserted only that his "statements regarding the extent and limiting effects of his symptoms are not consistent with the medical and other evidence in the record," without identifying any such statements that the ALJ found not to be true. AR at 33.

An ALJ need not "'perform a line-by-line exegesis' of the claimant's testimony," but the Ninth Circuit's "precedents plainly required the ALJ to do more than was done here, which consisted of offering non-specific conclusions that [the claimant's] testimony was inconsistent with her medical treatment." 980 F.3d at 1277. Like here, the ALJ in *Lambert* "did provide a relatively detailed overview of [the claimant's] medical history," but "'providing a summary of medical evidence . . . is not the same as providing clear and convincing *reasons* for finding the claimant's symptom testimony not credible.'" *Id.* at 1278 (quoting *Brown-Hunter*, 806 F.3d at 494) (ellipsis in original). A court "cannot review whether the ALJ provided specific, clear, and

convincing reasons for rejecting [a claimant's symptom] testimony where, as here, the ALJ never identified *which* testimony she found not credible, and never explained *which* evidence contradicted that testimony." *Id.* at 1277 (quoting *Brown-Hunter*, 806 F.3d at 494).

The same is true here. The Court cannot evaluate whether the ALJ provided sufficiently convincing reasons to discredit Plaintiff's symptom testimony when the ALJ did not say which testimony she declined to credit. That alone is grounds for reversal and remand. The Court nevertheless addresses two categories of testimony that stand out as significant and warrant further explanation: Plaintiff's repeated reports of knee instability resulting in falls, and his testimony that he stopped his HVAC work after his first fall in December of 2022.[10]

**1. Testimony Regarding Knee Instability**

The only specific testimony Plaintiff offered regarding his knee at the administrative hearing was that he stopped working because his "knee [failed] him," leaving him hanging from a ladder in December 2022, AR at 53, and he continues to have knee problems such that he "doesn't know when it's going to fail," AR at 59. The record also reflects Plaintiff's frequent reports to his medical providers of his knee buckling repeatedly and painfully over a period of more than a year, sometimes resulting in him falling down stairs and further injuring himself. *E.g.*, AR at 725 (December 1, 2022); AR at 747 (December 7, 2022); AR at 381 (December 23, 2022); AR at 372–73 (January 23, 2023); AR at 930 (June 14, 2023); AR at 869 (July 12, 2023); AR at 2106 (Aug. 16, 2023); AR at 906–07 (August 30, 2023); AR at 1506 (March 29, 2024); AR at 2494 (September 16, 2024); AR at 2510 (December 19, 2024).

It is not clear whether the ALJ disbelieved any or all of those reports. In finding Dr. Salamacha's opinions unpersuasive, the ALJ stated that Dr. Salamacha's note of unexpected knee buckling "appears to be based on [Plaintiff's] subjective reports," but the ALJ did not indicate whether she though those reports were false, or any reason—much less clear and convincing

[10] These are not intended as exclusive of other statements that would warrant further consideration or explanation on remand. For example, Plaintiff's statement in his function report that he required an extended break after walking for thirty to forty-five minutes is likely relevant to any assessment of disability. AR at 279. If the Commissioner does not believe that statement is true, the Commissioner must state so specifically and provide clear and convincing reasons. *See Lambert*, 980 F.3d at 1277–78.

reasons—to reach that conclusion if she did. AR at 34. The ALJ cited two incidents of Plaintiff reporting to other providers that he fell, but similarly offered no indication of whether she believed those reports to be false or reasons supporting such a finding. AR at 33 (citing August 16, 2023 report to Dr. Ong, Ex. 8F/597, AR at 2106; and September 2024 report to a primary care doctor, Ex. 8F/978, AR at 2487).

As Plaintiff testified at the hearing, his knee instability is highly relevant to his claimed disability. AR at 59. The ALJ's finding that Plaintiff's RFC allowed occasional climbing of ladders, ropes and scaffolds, AR at 29, as well as the ALJ's Step Four conclusion that Plaintiff could do his past work as an HVAC contractor, AR at 37—which Plaintiff indicated included climbing ladders and working on roofs—are facially inconsistent with that condition. Such work would place Plaintiff at risk of falling to his death or serious injury.

Not surprisingly, courts have treated impairments that create unacceptable risks of falling and other similar dangers as supporting a finding of disability when work is not available that would avoid such risks. *E.g.*, *Garcia v. Berryhill*, No. CV 15-9909-KK, 2017 WL 3741252, at *6 (C.D. Cal. Aug. 29, 2017); *West v. Comm'r of Soc. Sec.*, No. 1:16-cv-01377-EPG, 2018 WL 684771, at *3 (E.D. Cal. Feb. 1, 2018); *see also Leza v. Kijakazi*, No. 21-16079, 2022 WL 819782, at *1 (9th Cir. Mar. 17, 2022) (citing, as supporting a finding of disability, a doctor's opinion that a plaintiff's hypertension meant that "'even minimal stress' could 'put her life at risk'"). ALJs also routinely, where appropriate, include restrictions in claimants' RFCs prohibiting working at unprotected heights. *E.g.*, *Revels v. Berryhill*, 874 F.3d 648, 653 (9th Cir. 2017) *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012); *see also Natalie A. v. O'Malley*, No. 4:21cv00024, 2024 WL 3466586, at *10 (W.D. Va. July 18, 2024) (noting an ALJ's finding that a claimant's "narcolepsy precludes safely climbing ladders, ropes, and scaffolds or working in proximity to hazards"). Such a limitation is inherently based on risk: a medical impairment would not make it physically *impossible* for a claimant to be situated near a ledge, but it might render the chance of falling from such heights unacceptable. An RFC thus reflects work that a claimant can do *safely* in light of the claimant's impairments. Plaintiff's knee instability suggests that he could not do the work that the ALJ assessed without serious risk.

The ALJ's apparent disregard of Plaintiff's repeated reports of knee instability—or at least any significance of those symptoms—also undermines the ALJ's treatment of medical opinion evidence. The ALJ rejected Drs. Salamacha and Ong's opinions in part because the ALJ did not believe that medical imaging and the doctors' examinations supported the restrictions they assessed. AR at 34–35. The Commissioner contends that Dr. Salamacha could not reasonably have "extrapolate[ed]" a need for a cane from "Plaintiff's normal reciprocal gait, intact leg strength, and ability to walk on toes and heels during her examination constitutes." ECF No. 12 at 16. That analysis, both by the ALJ and in the Commissioner's brief, wholly disregards Plaintiff's repeated reports of knee instability and falls, which would seem to provide a logical basis for Drs. Salamacha and Ong's opinions that Plaintiff should limit his walking and use a cane for longer distances even in the absence of observed difficulty at the time of examination. Similarly, in rejecting an urgent care physician's recommendation that Plaintiff use a knee brace after a fall, the ALJ found "minimal evidence that the claimant needs" such a brace. AR at 36. In doing so, the ALJ inexplicably failed to address Plaintiff's repeated knee buckling and falls—like the one that brought Plaintiff to that clinic where the brace was recommended. AR at 36; *cf.* AR at 2509 (noting Plaintiff's report at that visit that "he was just walking and his right knee gave out under him . . . and he fell to side").

The ALJ's failure to address whether she credited Plaintiff's reports of knee instability, and to either account for that impairment if she did or provide clear and convincing reasons if she did not, is thus prejudicial error requiring reversal of the ALJ's non-disability decision.

**2. Plaintiff's Purported Ongoing Work**

The only aspect of Plaintiff's testimony (at least as is relevant to his knee impairment) that the ALJ seems clearly and specifically to have rejected is his statement that he ceased HVAC work in December of 2022. *See* AR at 25–26 (ALJ's decision noting ongoing work); AR at 52, 53 (Plaintiff's testimony that he stopped working). That finding may not require the same "clear and convincing" reasons under Ninth Circuit precedent, because it is not "testimony about the severity of [his] symptoms" that an impairment "could reasonably be expected to produce." *See Trevizo*, 871 F.3d at 678. Even so, the ALJ did not provide a sufficient explanation for her decision to

credit Plaintiff's written work report over his hearing testimony to allow for informed review as to whether that finding was supported by substantial evidence.

At the hearing, the ALJ asked Plaintiff about his report in January 2025 indicating ongoing HVAC work, and Plaintiff testified he completed that report erroneously. AR at 52. In her decision, the ALJ referenced that 2025 report, but only found that Plaintiff "appears to have continued" full-time HVAC "until at least February 2024," when he submitted a previous report. AR at 25–26. Later in the decision, she acknowledged his testimony that the 2025 report was an error, without making any finding as to whether that testimony was credible or accurate. AR at 30. The ALJ's decision therefore does not appear to have rested on a conclusion that Plaintiff testified falsely regarding work in 2025.

Perhaps notably, Plaintiff testified to only limited ability to write in English, which might support his testimony that he erred in completing a written form. AR at 61. Some portions of the ALJ's decision seem to call into doubt Plaintiff's purportedly limited English proficiency. AR at 30.[11] As with the veracity of the 2025 report, however, the ALJ stopped short of finding that Plaintiff's testimony about his language ability was false. The Court "may not affirm the ALJ on a ground upon which [s]he did not rely." *Garrison*, 759 F.3d at 1010.

Unlike the 2025 report, the ALJ did not ask Plaintiff at the hearing about his 2024 report that she ended up relying on. Considering his repeated testimony that he stopped his HVAC work in 2022, AR at 52, 53, perhaps he would have testified that he similarly erred in completing that form. If he did, perhaps the ALJ could and would have provided sufficient reasons to reject that testimony. Or perhaps not.

---

[11] Also, despite no indication in the record that the claimant required an interpreter at any time since his protective filing date, and the fact that he is noted by his medical providers to not require an interpreter (8F/96), his representative requested an interpreter a few days before the February 2025 hearing (25E). The request was granted and the claimant testified through an interpreter. However, the claimant testified that he has attended two years of college and has been a licensed HVAC technician for several years. He admitted that he took and passed the examination in English. He has worked (in the United States) as an HVAC mechanic since at least 2009 and for the past few years, has owned his own HVAC business.

AR at 30. Though not material to the outcome of this case, it is not clear why Plaintiff's two years of college in Nicaragua would establish English proficiency. AR 61.

As the record stands, however, the ALJ provided essentially[12] no reason for crediting Plaintiff's 2024 work report over his subsequent hearing testimony to the contrary, particularly when the ALJ's decision seems to have allowed for the possibility that the similar 2025 report was erroneous. The ALJ's failure "to specify . . . her reasons for finding claimant testimony not credible" leave this Court "unable to review those reasons meaningfully without improperly substituting [its] conclusions for the ALJ's, or speculating as to the grounds for the ALJ's conclusions." *Brown-Hunter*, 806 F.3d at 492 (internal citation omitted). That omission therefore requires reversal. *See id.*

Even if the conflicting evidence of whether Plaintiff continued to engage in HVAC work were resolved against him, that may not be dispositive of whether such work should be included in his RFC. As discussed above, the RFC assessment is based on work that a claimant can perform safely. The fact that Plaintiff may have placed himself at risk does not show that Plaintiff could do that work safely. This analysis differs from the Step 1 question of whether Plaintiff continued to engage in substantial gainful activity (SGA), where such work is preclusive of disability as a matter of law. The ALJ determined at Step 1 that whatever degree of work Plaintiff still did after his alleged onset date did not rise to the level of SGA, and thus did not warrant a finding of non-disability at that analytical step. AR at 25–26. Any work that Plaintiff continued to perform at a level below SGA could still be *evidence* of what he was capable of doing for the purpose of assessing an RFC, but the Court is not aware of authority suggesting that it is *dispositive* of whether such work is appropriate for him in light of his impairments. In other words, it is not clear that someone who places themself at unreasonable risk by continuing to work at sub-SGA levels while awaiting a determination of disability should be found not disabled on that basis.

**B. Medical Opinion Evidence**

Plaintiff contends that the ALJ erred in rejecting the opinions of Drs. Salamacha and Ong.

---

[12] The ALJ asserted that unspecified "references throughout the medical records confirm continued work activity." AR at 26. In response to Plaintiff's argument that there are no such records, ECF No. 8 at 11, the Commissioner cites only Dr. Ong having placed Plaintiff on "modified activity at work and at home," ECF No. 12 at 11. Those restrictions do not imply that Plaintiff was actually working.

> "The most important factors" that the agency considers when evaluating the persuasiveness of medical opinions are "supportability" and "consistency." 20 C.F.R. § 404.1520c(a). Supportability means the extent to which a medical source supports the medical opinion by explaining the "relevant . . . objective medical evidence." *Id.* § 404.1520c(c)(1). Consistency means the extent to which a medical opinion is "consistent . . . with the evidence from other medical sources and nonmedical sources in the claim." *Id.* § 404.1520c(c)(2).

*Woods v. Kijakazi*, 32 F.4th 785, 791–92 (9th Cir. 2022). An ALJ's reasons for rejecting medical opinion evidence must be valid and supported by the record. *Fain v. Bisignano*, __ F.4th __, 2026 WL 2795427, at *3 (9th Cir. Sept. 18, 2026).

Here, as discussed above, the primary reason the ALJ provided for rejecting Drs. Salamacha and Ong's opinions was the ALJ did not believe that their objective findings supported such restrictions, AR at 34–35, even though the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause [his] alleged symptoms," AR at 31. In reaching that conclusion the ALJ failed to account for Plaintiff's repeated reports of intermittent knee instability causing buckling and falls, which both Dr. Salamacha and Dr. Ong acknowledged throughout their notes. Where "the restrictions that [a doctor] recommended were based on Claimant's own estimates of [their] abilities," the ALJ cannot reject the doctor's opinions that arise from the claimant's reports unless the claimant "explain[s] why Claimant's self-estimates are not reliable." *Fain*, __ F.4th at __, 2026 WL 2795427, at *3. The ALJ did not do so here, and thus erred in rejecting Dr. Salamacha and Dr. Ong's opinions to the extent they were based on Plaintiff's reported knee instability.

Nor do those doctors' examination findings undermine Plaintiff's reports of instability. True, Dr. Salamacha observed normal gait, AR at 1506, but tests of gait during a short examination do not undermine claims of intermittent knee instability that might not manifest during that examination. *See, e.g.*, AR at 930 (noting that Plaintiff reported only experiencing pain when his knee gave out, which at that time was occurring a few times a week, but he had no pain during a physical therapy appointment). "Normal results of strength, gait, and range of motion tests, without more, do not contradict diagnoses based on pain where the results do not indicate whether the test accounted for the relevant pain," because "a patient might be able to push

herself to exhibit full strength or range of motion, or a normal gait, while also experiencing pain." *Ortiz v. Bisignano*, 179 F.4th 691, 699 (9th Cir 2026). Similarly, such observations in a controlled environment do not contradict a doctor's assessment that a patient is likely to experience symptoms over more extended periods of walking.

The ALJ's failure to account for Plaintiff's knee instability in rejecting Drs. Salamacha and Ong's opinions is error requiring reversal. The Court only briefly addresses some of Plaintiff's other arguments, as well as other discrepancies apparent from the record.

The ALJ asserted without citation to evidence that "quadriceps tendonitis would be expected to improve within less than 12 months, which would not satisfy the duration requirement." AR at 35. As Plaintiff notes, that assertion contradicts the ALJ's Step 2 finding that "tendinitis of the right quadriceps tendon" is a severe impairment, AR at 26, which required the ALJ to find that it lasted or would be expected to last at least that long, 20 C.F.R. § 404.1520(a)(ii) (citing 20 C.F.R. § 404.1509). Remand is appropriate to resolve an "internally inconsistent" decision by an ALJ. *Perez v. Astrue*, 250 F. App'x 774, 776 (9th Cir. 2007). The ALJ's assertion also contradicts the record, where Plaintiff's quadriceps tendonitis was diagnosed repeatedly as a primary cause of Plaintiff's knee problems over a period of more than a year from December 2022 (AR at 392) to March 2024 (AR at 1507–08), and where the intermittent knee instability that the doctors attributed to that tendonitis continued at least to December 2024 (AR at 2509).

The ALJ relied in part on Plaintiff's reported lawn-mowing and other chores as undermining Dr. Salamacha's opinions. AR at 35. Plaintiff reported that he mowed the lawn for two hours, and there is no indication that he did any other chores for longer than that. AR at 276. Dr. Salamacha assessed that Plaintiff could stand and walk for up to two hours in each half of the workday. AR at 1508. There is no conflict between those opinions.

The ALJ repeatedly asserted that Plaintiff was not referred for a cane, citing page 63 of Exhibit 8F in the administrative record. AR at 32, 35. That page of the record says nothing about treatment or prescriptions for Plaintiff's knee injury, or about a cane. AR at 1572. It instead describes test results related to an emergency room visit in October 2022 after Plaintiff passed out,

which does not appear to have been related to the knee impairment that is the focus of Plaintiff's arguments here. *See* AR at 1548. As the ALJ acknowledged, Plaintiff appeared with a cane for both his March 2024 examination by Dr. Salamacha and his December 2024 urgent care visit. AR at 32–33, 1506, 2509. Looking earlier in the record, neither the ALJ nor the parties addressed that Dr. Ong listed (and apparently emphasized) a "**Cane**" as a component of Plaintiff's treatment in August 2023, AR at 907, thus contradicting the ALJ's reasoning that a cane was never recommended.

The Commissioner makes much of Plaintiff having declined a cortisone shot that Dr. Ong offered in August of 2023. ECF No. 12 at 9–10. Dr. Ong's notes indicate that Plaintiff at that time was experiencing "anterior knee pain that is improving after a fall when his leg gave out" and "very inhibited right quadricep muscle strength." AR at 1056. Dr. Ong also noted, as a distinct symptom, that Plaintiff had "[m]ild tenderness along the medial aspect of the knee where his arthritis is located," consistent with the "tiny spurs" indicating "early arthritis" that Dr. Ong saw on Plaintiff's x-ray. *Id.* Dr. Ong offered the "cortisone injection to help with [that] medial sided knee pain" from arthritis, which Plaintiff's doctors did not identify as a significant cause of his limitations, not for his quadricep tendonitis or any other condition. *Id.* Dr. Ong also only suggested that the cortisone shot would help with pain, not with Plaintiff's knee instability. *Id.* Plaintiff's decision not to pursue a second cortisone shot for mild tenderness from arthritis, after a first shot six months earlier provided little relief, is not substantial evidence to disregard Drs. Salamacha and Ong's opinions regarding the limiting effects of his quadricep tendonitis, and the knee instability that apparently resulted from his tendonitis.

The ALJ also noted in passing that Plaintiff declined prolotherapy at the same appointment with Dr. Ong. AR at 32. Dr. Ong noted "[p]ossible prolotherapy to quadricep tendon but can increase pain temporarily, he currently not interested." AR at 1056. It is not clear whether Dr. Ong recommended that treatment as opposed to merely mentioning it as a possibility. There is no other evidence in the record that prolotherapy would be recommended to treat Plaintiff's tendonitis. Nor is it clear that the ALJ considered Plaintiff's decision not to pursue that particular

treatment modality to be a reason to reject any opinion.[13] To the extent the ALJ may also have relied on Plaintiff's apparent failure to follow up for further physical therapy, the record is not clear if or why Plaintiff may have failed to do so.

Because remand is necessary for the reasons discussed above, this is not intended as a complete resolution of all arguments Plaintiff has raised regarding the ALJ's treatment of medical opinion evidence. The Commissioner is encouraged to consider all of Plaintiff's arguments on remand.

### C. Remand for Further Proceedings Is Necessary

"When the ALJ denied benefits and the court finds error, the court ordinarily must remand to the agency for further proceedings before directing an award of benefits." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017). The Ninth Circuit recognizes a narrow exception for certain cases where the Commissioner improperly found a claimant or doctor's opinions not credible. That "credit-as-true" rule applies only when the following three elements are established:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand

*Garrison*, 759 F.3d at 1020 (emphasis added).

"When all three elements of this . . . rule are satisfied, a case raises the 'rare circumstances' that allow [a court] to exercise [its] discretion to depart from the ordinary remand rule." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1101 (9th Cir. 2014). Courts may apply the credit-as-true rule only if crediting a claimant's testimony or a medical opinion would "leave not the slightest uncertainty as to the outcome of the proceedings." *See id.* 1100–01.

---

[13] Though not addressed by the parties and not necessary to the outcome of this case, the Court notes that Medicare does not reimburse prolotherapy because its "medical effectiveness . . . has not been verified by scientifically controlled studies." U.S. Ctrs. For Medicare & Medicaid Servs., Medicare Coverage Database, National Coverage Determination: Prolotherapy, Joint Sclerotherapy, and Ligamentous Injections Sclerosing Agents, *available at* https://www.cms.gov/medicare-coverage-database/view/ncd.aspx?NCDId=15&NCDver=1 [https://perma.cc/KG6V-VK7M].

Plaintiff contends that "had Dr. Salamacha's opinions been found persuasive, the conclusion of disability would have been warranted under grid rule 202.06," because Plaintiff would be unable to do his past work and limited to less than medium work. ECF No. 8 at 13. That regulatory provision states that if a claimant of Plaintiff's age and education is limited to light work and has no transferable skills, the claimant will be found disabled. 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.06. The same is not true for a claimant who can perform medium work. *Id.* § 203.15. A claimant who falls somewhere between would also require further analysis using the generally applicable principles of the five-step test. *Id.* § 200.00(d).

Plaintiff argues that Dr. Salamacha's opinions establish disability because even light work requires standing or walking for up to six hours per day, and "the ability to stand/walk no more than four hours per eight-hour workday" does not meet that test. ECF No. 8 at 12. Strangely, none of Plaintiff, the Commissioner, the ALJ, nor the VE addressed a facial contradiction in Dr. Salamacha's opinion. She stated that Plaintiff could "stand and walk on level surfaces for two hours in the first half and two hours in the second half up to a maximum of *six* hours in an eight-hour period." AR at 1508 (emphasis added). The ALJ repeated that inconsistency in a hypothetical posed to the VE. AR at 64. It is unclear whether Dr. Salamacha intended to allow walking and standing up to four hours per day (two hours in each half), which would not allow for even light work, or up to six hours per day, which might allow for more than light work. Even presuming that Dr. Salamacha's opinions could otherwise be credited, that inconsistency leaves uncertainty as to whether Plaintiff meets the definition for disability under the grid rule Plaintiff cites, and thus requires further consideration on remand.

Plaintiff also briefly argues that Dr. Ong's opinions should be credited and benefits should be awarded on that basis. ECF No. 8 at 15. Dr. Ong assessed greater limitations on standing and walking than Dr. Salamacha, whose opinions Plaintiff also asserts should be credited. To the extent Dr. Salamacha's opinions might not establish disability (as discussed above), remand would be necessary to address any discrepancy between Dr. Ong's opinions and Dr. Salamacha's.

Plaintiff's inconsistent representations regarding continued HVAC work into 2024 and 2025 also introduce more than "the slightest uncertainty as to the outcome of the proceedings."

*See Treichler*, 775 F.3d at 1100–01. Exactly what if any such work Plaintiff continued to do would inform his ability to perform other work, even if his knee instability prevented him from performing his previous work climbing ladders.

The Court therefore cannot say that "further administrative proceedings would serve no useful purpose." *See Garrison*, 759 F.3d at 1020. With that first step of the credit-as-true rule not satisfied, the case must be remanded for further administrative proceedings.

## V. CONCLUSION

For the reasons discussed above, the decision of the Commissioner finding Plaintiff not disabled is REVERSED, and Plaintiff's application is REMANDED for further administrative proceedings consistent with this Order. The Clerk shall enter judgment in favor of Plaintiff and close the case.

**IT IS SO ORDERED.**

Dated: September 30, 2026

LISA J. CISNEROS
United States Magistrate Judge